RECORD NO. 22-4

In The

# United States Court of Appeals

## For The Fourth Circuit

**STEVEN VERNON BIXBY,**

*Petitioner – Appellant,*

**v.**

**BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections; LYDELL CHESTNUT, Deputy Warden of Broad River Correctional Institution Secure Facility,**

*Respondents – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT FLORENCE

---

BRIEF OF APPELLANT

---

**John G. Baker**
FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF NORTH CAROLINA

**David Weiss**
**Gretchen L. Swift**
**Assistant Federal Public Defenders**
**129 West Trade Street, Suite 300**
**Charlotte, NC  28202**
**(704) 374-0720**

**Joshua Snow Kendrick**
KENDRICK & LEONARD, P.C.
**Post Office Box 6938**
**Greenville, SC 29606**
**(864) 760-4000**

*Counsel for Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUE..................................................................1

STATEMENT OF THE CASE....................................................................1

    A.    Steven Bixby endured severe trauma as a child, struggled with
    severe mental illness, and has a damaged brain....................................2

    B.    Mr. Bixby's involvement in the capital crime is connected
    directly to his dysfunctional upbringing and the delusions about
    government authority that his mentally ill parents instilled in
    him since he was a child.......................................................................9

    C.    During post-trial review in state court, Mr. Bixby came within a
    single vote of the South Carolina Supreme Court vacating his
    death sentence...................................................................................10

    D.    In federal district court review, Mr. Bixby's attorneys admitted
    they lacked experience in capital habeas cases, failed to raise
    the federal constitutional claims that lost narrowly in state
    court, and failed to submit original work product or to address
    the key legal questions in the case ....................................................13

SUMMARY OF ARGUMENT ...............................................................18

STANDARDS OF REVIEW ...................................................................21

ARGUMENT ..........................................................................................23

    I.    The district court erred in holding that it lacked jurisdiction
    over Mr. Bixby's motion for relief pursuant to Rule 60(b)(6) on
    the ground that the motion was in substance a successive
    habeas petition..................................................................................23

A.  Supreme Court precedent instructs that federal courts have jurisdiction to consider Rule 60(b) motions based on allegations of extraordinary attorney misconduct. The district court below erred in failing to recognize this precedent and ruling otherwise .................................................23

B.  Because the district court's only ruling was its erroneous decision that it lacked jurisdiction over the Rule 60(b) motion, and it did not reach the merits, the appropriate remedy is for the Court to remand Mr. Bixby's motion for full merits review ...............................................................35

CONCLUSION ......................................................................................................42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Aikens v. Ingram*,
  652 F.3d 496 (4th Cir. 2011) ........................................................................41

*Bixby v. South Carolina*,
  138 S. Ct. 361 (2017)...................................................................................13

*Buck v. Davis*,
  137 S. Ct. 759 (2017)...............................................................................29, 30

*Conboy v. U.S. Small Bus. Admin.*,
  992 F.3d 153 (3d Cir. 2021) ...........................................................................38

*Gallagher v. Reliance Standard Life Insurance Co.*,
  305 F.3d 264 (4th Cir. 2002) .........................................................................22

*Gamboa v. Davis*,
  782 F. App'x 297 (5th Cir. 2019) .............................................................32, 33

*Gonzalez v. Crosby*,
  545 U.S. 524 (2005)...............................................................................*passim*

*Harris v. U.S.*,
  367 F.3d 74 (2d Cir. 2004) ............................................................................25

*Holland v. Florida*,
  560 U.S. 631 (2010)...............................................................................*passim*

*In re Coleman*,
  768 F.3d 367 (2014) .................................................................................32, 33

*In re Pickard*,
  681 F.3d 1201 (10th Cir. 2012) .....................................................................29

*Kerns v. U.S.*,
    585 F.3d 187 (4th Cir. 2009) ........................................................................34

*Klapprott v. U.S.*,
    335 U.S. 601 (1949) .....................................................................................41

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988) ....................................................................................36

*Maples v. Thomas*,
    565 U.S. 266 (2012) ............................................................................*passim*

*Martel v. Clair*,
    565 U.S. 648 (2012) .....................................................................................27

*Martinez v. Ryan*,
    566 U.S. 1 (2012) ...................................................................................30, 37

*McFarland v. Scott*,
    512 U.S. 849 (1994) .....................................................................................27

*McKnight v. Bishop*,
    771 F. App'x 201 (4th Cir. 2019) ...............................................................22

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) .....................................................................................38

*Morgan v. Illinois*,
    504 U.S. 719 (1992) .....................................................................................12

*N.C. State Bar v. Megaro*,
    2022-NCCOA-718 (N.C. App. 2022) ..........................................................39

*Operating Engineers Pension Trust v. A-C Co.*,
    859 F.2d 1336 (9th Cir. 1988) .....................................................................39

*Payne v. Tennessee*,
    501 U.S. 808 (1991) .....................................................................................12

*Reid v. Angelone*,
    369 F.3d 363 (4th Cir. 2004) ...........................................................23, 26, 41

*Richardson v. Thomas*,
    930 F.3d 587 (4th Cir. 2019) .....................................................24, 26, 31, 32

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991).......................................................................................22

*Schriro v. Landrigan*,
    550 U.S. 465 (2007)........................................................................................39

*Shuler v. Clarke*,
    No. 21-7770, 2022 WL 2990140 (4th Cir. 2020)........................................21

*State v. Bixby*, 388 S.C. 528 (2010).........................................................................................11

*Stone v. Instrumentation Laboratory Co.*,
    591 F.3d 239 (4th Cir. 2009) .......................................................................22

*U.S. v. McCrae*,
    793 F.3d 392 (4th Cir. 2015) ...........................................................21, 22, 36

*U.S. v. Vialva*,
    904 F.3d 356 (5th Cir. 2018) .......................................................................29

*U.S. v. Welsh*,
    879 F.3d 530 (4th Cir. 2018) .......................................................................37

*U.S. v. Winestock*,
    340 F.3d 200 (4th Cir. 2003) .......................................................................22

## **STATUTES**

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 2253 .......................................................................................................1

28 U.S.C. § 2244 .....................................................................................................24

28 U.S.C. § 2254 .......................................................................................*passim*

28 U.S.C. § 2254(d) .........................................................................27, 39

## **RULES**

Fed. R. Civ. P. 60(b) .........................................................................*passim*

S.C. Rules of Professional Conduct, Rule 1.1, Comment 2 ...................................39

S.C. Rules of Professional Conduct, Rule 1.1, Comment 5 ...................................40

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253. Mr. Bixby

filed a Motion for Relief Pursuant to Fed. R. Civ. P. 60(b). JA1823. Following full

briefing, the district court denied relief and a certificate of appealability. JA1903.

Mr. Bixby filed a notice of appeal on August 19, 2022. JA1913.

## STATEMENT OF THE ISSUE

I.    Did the district court err in holding that it lacked jurisdiction over Mr.
      Bixby's motion for relief pursuant to Rule 60(b)(6) on the ground that the
      motion was in substance a successive habeas petition?

## STATEMENT OF THE CASE

This appeal raises a narrow issue: the district court's error in deeming itself

without jurisdiction to consider a Rule 60(b) motion by Steven Bixby, a death-

sentenced prisoner. The district court mistakenly treated Mr. Bixby's 60(b) motion

as a successive habeas petition.

The consequences of the district court's jurisdictional error are broad. As

detailed below, the initial federal habeas proceedings that Mr. Bixby seeks to

reopen were scuttled by the egregious errors and misconduct of his counsel, and

the failure of the district court that appointed them to guarantee that Mr. Bixby

received competent representation. The result was that two claims on which the

South Carolina Supreme Court narrowly denied relief, by a 3-2 margin, were never

presented on federal habeas review.

1

However, before addressing the egregiousness of capital habeas counsel's conduct and the district court's abdication of its role, this brief will provide a full picture of Mr. Bixby and the events that landed him on death row. This context underscores the consequences of the unusual malfunction in district court proceedings, and why remand is essential in this case.

### A.     Steven Bixby endured severe trauma as a child, struggled with severe mental illness, and has a damaged brain.

Evidence presented at trial and during state post-conviction proceedings revealed that Steven Bixby endured physical, emotional, and sexual abuse, as well as poverty and parental mental illness, when he was a child.

Mr. Bixby's father, Arthur, was an alcoholic. JA525, JA641. He physically abused his wife, Rita, and their children and step-children, including Mr. Bixby's older brother who had cerebral palsy. JA641, JA643. His children saw the bruises he left on their mother and the broken furniture after a fight. JA684. His violence wasn't reserved for his family – but for neighbors and family pets too. He would sometimes sit on his porch with a shotgun to frighten neighbors with whom he was in a dispute. JA525-526. When Mr. Bixby was a boy, Arthur shot and killed the family dog right in front of him and his siblings. *Id*. After Arthur's arrest in 2003 for the capital crime that led to Steven's death sentence, Arthur's mental illness was confirmed; he was diagnosed with schizophrenia and ultimately found to be

incompetent to stand trial. JA690-691. Arthur was also diagnosed with cognitive disorder, delusional disorder, and dementia after his arrest. JA692.[1]

Mr. Bixby's mother, Rita, was no better – she was also a drinker and was merciless in her physical abuse of the children. JA529. She would line the children up by age, with Mr. Bixby last in line and beat them one-by-one with a leather strap, typically for no reason. JA643. After the beatings, she required the children to wear long sleeves and pants to hide their bruises and threatened them not to tell anyone. Rita made the children's clothes and if they were ever ripped or torn, she would beat them. JA532. Rita also starved the children – if they were late to dinner, even by minutes, they would be sent to bed without eating. JA642. Not surprisingly, Rita struggled with mental illness and was repeatedly medicated for anxiety and paranoia, "nerve problems," depression and even possible delusions. JA529, JA641, JA689-690.

Mr. Bixby not only suffered physical and emotional abuse at home, but he was repeatedly sexually abused as a child and young adult by his older sister, Deb. JA540, JA679. Mr. Bixby reported this abuse to his attorneys and several mental health professionals and was found to be credible. JA540, JA700, JA842.

---

[1] Arthur Bixby died in prison in September 2011. JA692.

In this turbulent atmosphere, the Bixby's also struggled financially. Arthur's work as a self-employed carpenter and contractor was unpredictable and low-paying. JA531, JA640. Long, cold winters in New Hampshire meant that work was hard to come by. Rita worked as a seamstress at times, but never held a steady job. Both Rita and Arthur had limited education – Rita didn't go to school after the eighth grade. JA640-641. As a result, there were times that the Bixby's did not have the money to heat their New Hampshire home and woke to frost on the bedsheets. JA532. When Mr. Bixby was eleven, the family car was repossessed; when he was fourteen, their land was repossessed. JA529, JA645. Though Mr. Bixby and his siblings worked to help support the family even in their youth, without a steady income, they often lived in poverty. JA531-532.

The Bixby's alcoholism, poverty, and mental illness were a dangerous combination not just at home, but also in the community. Rita and Arthur were aggressive and volatile – constantly engaged in frivolous litigation with neighbors, the school system, and even their own son. JA530, JA645. In dismissing one of their many lawsuits, a judge noted that the Bixby's disregard for the judicial process and scurrilous allegations was "the most flagrant abuse of process this court in over seventeen years as a judge at the state and federal level has ever been privy to." JA531. Rita and Arthur accused members of the New Hampshire district and superior courts with fraud and deception, and accused judges of vindictiveness,

political machinations, and abuse of power. The judge concluded that "[s]imilar unsubstantiated allegations by a member of the New Hampshire Bar would result in swift remedial action and most likely disbarment." JA531.

Rita and Arthur's behavior did not just impact their reputation, but also their children. Because they lived in a sparsely populated, rural area, the entire family was socially ostracized and isolated. Rita and Arthur exacerbated the impact of this isolation on the children by refusing to allow them to socialize with other children, and ultimately withdrawing them from school for homeschooling when Steve was in seventh grade. JA642-645. Steve never returned to school. JA415-417.

Homeschool did provide relief for Mr. Bixby, who was bullied and teased often at schools. JA643. When he was five or six, Mr. Bixby had to get thick glasses to correct his strabismus, an eye condition which could have been corrected had his parents sought treatment earlier in his life. However, because Rita and Arthur neglected to get help, Mr. Bixby was cross-eyed and forced to wear thick glasses. JA643. Teachers and family members reported that Mr. Bixby was teased, picked on, and bullied by other children because of his eyes and his academic struggles. Mr. Bixby's teachers also noted that he had emotional problems and suspected that he was abused at home. JA539.

The combination of physical, emotional, and sexual abuse, poverty, and familial history of mental illness made it almost a sure thing that Mr. Bixby would

also struggle with major mental illness. In the years prior to his arrest, Mr. Bixby was diagnosed with depressive disorder and treated with antidepressants; he also had multiple suicide attempts. JA673. On at least one occasion in 1997, mental health professionals considered involuntarily committing Mr. Bixby due to suicidality and the severity of his depression. JA675-676.

During this time, Mr. Bixby expressed some paranoid and conspiratorial beliefs to a clinician he saw for a work-related injury. Mr. Bixby seemed convinced that the doctor was conspiring to undermine his worker's compensation claim. The doctor noted that "[H]e is very upset today, is very accusatory, threatening, threatened a lawsuit for he feels to be a grand conspiracy against him. [N]o amount of education would change this gentleman's opinion." JA540. The doctor indicated in his notes that Mr. Bixby's conspiratorial beliefs were likely related to an underlying psychiatric impairment. *Id*.

Upon his arrest in 2003 in this case, Mr. Bixby was diagnosed by neuropsychiatrist Dr. Donna Schwartz-Watts with schizoaffective disorder, a form of schizophrenia wherein a person also displays symptoms of bipolar disorder. JA916-917, JA945, JA961-963. Neuropsychiatrist Dr. Shawn Agharkar agreed with that diagnosis during state post-conviction review, or PCR. JA722-723; JA732-733. A person with schizoaffective disorder has periods of mood disorder and periods of psychosis, as well as paranoid and grandiose delusions, visual

hallucinations and mood symptoms. JA550. Drs. Schwartz-Watts and Agharkar observed that Mr. Bixby displayed all of these symptoms and typically viewed the world through a "lens of paranoia and persecution." JA549-550, JA721, JA727, JA733.

Mr. Bixby also had ideas of reference – perceiving significance in random occurrences. For instance, he reported that the flicker of a streetlamp was God telling him that he was doing the right thing. JA550. In addition, Mr. Bixby struggled with "disorganized thinking—very bazaar beliefs" and was at times psychotic. *Id*. During PCR, Mr. Bixby told Dr. Agharkar that the government had implanted a tracking device in his body to monitor him at the prison. JA721. Dr. Agharkar reported that this thinking is in "the realm of psychosis." JA724.

Mr. Bixby's mental illness was exacerbated by pervasive brain damage associated with severe head trauma. In PCR, neuroscientist Ruben Gur testified that Mr. Bixby had brain damage in his frontal, right parietal, occipital, and temporal lobes.[2] JA577, JA579, JA587-590. Damage in these areas cause impairments that greatly impacted Mr. Bixby's functioning. Frontal lobe damage

---

[2] Dr. Gur testified during PCR that he was able to use neuroimaging and neuropsychological testing to pinpoint Mr. Bixby's severe brain damage. Dr. Gur explained that it was likely that the damage was caused by head trauma. Indeed, in 1988, Mr. Bixby was hit in the head with a piece of lumber and was knocked unconscious. JA661.

causes a person to have mood lability, to fly off the handle, to become disinhibited, and to be impulsive. JA586. Damage to the parietal lobe is associated with poor integration of auditory and visual input, an altered personality, inattention, and paranoia. JA583, JA591. Temporal lobe damage affects memory, speech comprehension, personality, emotional stability, and causes hyper-religiosity. JA580-581. Each area is important for regulating behavior, especially during stressful and emotional situations. These areas are also important for adequate executive functions and memory. JA593. Dr. Gur testified that Mr. Bixby's brain damage "substantially impairs his thought processes, ability to understand and interpret the world around him, control and understand his emotions, and to control his impulses in such a way that makes it difficult for him to function normally." JA604-605. Dr. Gur opined that "Bixby's behavior, including his behavior at the time of the offense, [wa]s affected by his brain damage and organic brain disorder." JA706-707. Dr. Schwartz-Watts, who evaluated Mr. Bixby prior to trial, agreed that Mr. Bixby had brain damage. JA941.

In addition, intelligence testing prior to trial by Dr. Tora Brawley demonstrated that Mr. Bixby's IQ also "falls into the low, low average, range of intellectual functioning." JA500. He has a full-scale IQ of 84, with a verbal score of 89 and a performance IQ of 80. *Id*. Moreover, Mr. Bixby's scores on performance sub-tests confirm the frontal lobe damage later identified by

neuroimaging and neuropsychological testing. JA501. As Dr. Brawley noted, "the

frontal lobe is our filter. It helps us control our impulses, use judgment, understand,

sequencing of things, consequences … frontal lobe is what keeps us from acting

impulsively and doing things and saying things that we probably should not do."

JA506. Mr. Bixby's filter is severely impaired.

It is for these reasons that Mr. Bixby was more susceptible to his mother's

domination and delusions and was willing to participate in the offense. *Because* he

suffers from childhood trauma, major mental illness, and pervasive brain damage,

Mr. Bixby was particularly vulnerable to his mother's "forceable indoctrination"

and to involvement in the events at his parent's home in 2003. JA477-479.

> **B.    Mr. Bixby's involvement in the capital crime is connected directly to his dysfunctional upbringing and the delusions about government authority that his mentally ill parents instilled in him since he was a child.**

On December 4 and 5, 2003, SCDOT officials came to Rita and Arthur's

home and told them that they would seize a portion of their property for a right of

way for a new highway. JA1459-1460. Distraught, the Bixby's questioned the

legitimacy of the right of way and proclaimed that they would fight to the death

with anyone who trespassed on their property. *Id*. When SCDOT officials said they

would return with the Sheriff's department, Rita claimed that the Sheriff had no

authority over them on their private property. *Id*. The Bixby's then faxed letters to

the Governor, Senator Lindsey Graham, and other government officials to "see if

one of them would take some action, see if they would give us some help to get things straightened out for us." JA255-261. No one responded. JA260-0261.

Over the weekend, Mr. Bixby told his girlfriend and her daughter about the conflict his parents were having with SCDOT and said that he and his father would shoot any law enforcement officers who came on their property. JA1460-1461. They called and left messages with an Abbeville Sheriff's deputy to caution them. *Id*. The deputy called his supervisor and left a message to warn him as well. *Id*.

On Monday, December 8, 2003, SCDOT officials met with Deputy Danny Wilson at the Sheriff's department. *Id*. Wilson was instructed not to go to the Bixby's property alone. Shortly after 8:30 a.m., however, Deputy Wilson went to the Bixby's property. JA1461. Wilson was shot and killed. *Id*. Constable Donnie Ouzts was killed an hour later when he also entered the Bixby's property. JA1462. Bixby and his father remained in the house, surrounded by approximately fifty law enforcement officers. *Id*. After ten hours, law enforcement sent robots, tear gas, and SWAT teams inside; after a brief exchange of gunfire, Mr. Bixby surrendered. *Id*.

**C.    During post-trial review in state court, Mr. Bixby came within a single vote of the South Carolina Supreme Court vacating his death sentence.**

Steven Bixby proceeded to trial for the murders of Wilson and Ouzts in February 2007. JA1463. The jury found him guilty on all counts and sentenced Mr.

Bixby to death. JA1464. Arthur was found incompetent to stand trial and died in prison. JA690-691, JA639. Rita was found guilty of accessory before the fact to murder and criminal conspiracy and was sentenced to life in prison. *State v. Bixby*, 2010 S.C. App. LEXIS 261. She also died in prison. JA639.

On direct appeal, Mr. Bixby argued that the trial court improperly prevented his counsel from questioning jurors during voir dire about the legal definition of murder. *State v. Bixby*, 388 S.C. 528 (2010). Mr. Bixby argued that his ability to challenge those jurors who would automatically vote for the death penalty was impaired by this limitation. A slight three-justice majority of the South Carolina Supreme Court found that Mr. Bixby was procedurally barred from making this argument because he did not exhaust all his peremptory challenges. Two justices dissented, finding that "the number of peremptory challenges used is irrelevant" where "it is reversible error to limit questions in a manner that renders the trial fundamentally unfair." *Bixby*, 388 S.C. at 561. The dissent recognized that "a number of jurors" were dismissed for cause after being questioned about their understanding of the definition of murder and held that:

> Once the trial judge refused to allow appellant to define murder …
> and declined appellant's request that the trial judge himself define that
> term, appellant was left without the means to make informed
> decisions about challenges for cause or the exercise of his peremptory
> challenges.

*Id*. at 562. For these reasons, the dissenters, relying in part on *Morgan v. Illinois*, 504 U.S. 719 (1992), held that Mr. Bixby was denied his right to a fair sentencing proceeding and entitled to reversal.

Mr. Bixby also argued that the admission of a seven-minute video of portions of the victim's funeral at his sentencing proceeding was error because it elicited unfair prejudice and sympathy and was not proper victim impact evidence under *Payne v. Tennessee*, 501 U.S. 808 (1991). The video showed the victim's closed coffin, numerous mourners, the playing of "Taps" by a trumpet, and a staged 911 call telling the victim to "return home" that is often played at law enforcement funerals. *Id*. at 554-555. Again, a slight majority of the South Carolina Supreme Court denied relief, but the same two justices dissented, finding that the video was improper victim impact evidence where it "did not demonstrate anything about the victim's uniqueness or the impact of his loss on his family or friends or on community groups." *Id*. at 564. As the dissenters held, "*Payne* evidence must be presented through the testimony of those who have suffered as a result of the victim's death" – not a funeral video and staged 911 call. The dissenters would have reversed and remanded for a new sentencing proceeding. *Id*. at 564-565.

Shortly after the conclusion of appellate proceedings, Mr. Bixby filed an application for post-conviction relief which included numerous claims of ineffectiveness of trial and appellate counsel as well as claims of jury misconduct and an unconstitutional jury instruction. JA1469-1472. Following an evidentiary hearing, the PCR court denied relief in an order virtually identical to the State's post-hearing brief. JA12 et seq.; JA1599-1601 (detailing similarities between the PCR order and the State's brief). Mr. Bixby petitioned the South Carolina Supreme Court for certiorari but was denied. The United States Supreme Court also denied certiorari. *Bixby v. South Carolina*, 138 S. Ct. 361 (2017).

> **D.    In federal district court review, Mr. Bixby's attorneys admitted they lacked experience in capital habeas cases, failed to raise the federal constitutional claims that lost narrowly in state court, and failed to submit original work product or to address the key legal questions in the case.**

When Mr. Bixby initiated federal habeas proceedings, he identified and requested the appointment of two highly qualified attorneys, one of whom had specialized in capital defense and habeas litigation for decades. JA84-89. Instead, the magistrate appointed two different lawyers who, shortly after appointment, filed a motion for more time because "they did not currently specialize in federal death penalty habeas corpus cases of this type." JA91-93; JA1194-1199.

The pleadings submitted by habeas counsel reflected their inexperience. Counsel failed to assert any of the federal constitutional claims that were raised on direct review, including the two claims that drew dissents from two South Carolina justices. Instead, they submitted a 76-page "full petition" that was essentially a petition in name only. Sixty-one of the 76 pages were copied directly from the South Carolina Supreme Court's direct appeal opinion and Mr. Bixby's state PCR application. JA1246-1320. Their regurgitation of the state PCR claims failed to include any original argument or authority, or to even acknowledge the PCR court's rulings on those claims. JA1317-1320. The "petition" raised only one entirely new and frivolous argument – that trial counsel failed to protect Bixby's rights under the Americans with Disabilities Act – but offered nothing to support this nonsensical, three-sentence-long claim. JA1320.

Most critically, at no point in any of their briefing did habeas counsel address the central issue facing the district court: whether the state courts' adjudication of Mr. Bixby's claims was contrary to or an unreasonable application of U.S. Supreme Court precedent, based upon unreasonable fact-findings, or otherwise fell within 28 U.S.C. § 2254's limitations on relief. While the "full" petition's first sentence stated that it was "filed pursuant to 28 U.S.C. § 2254," habeas counsel did not cite the federal habeas statute a single time. JA1246.

14

In issuing his report and recommendation, the magistrate judge was not shy about expressing his determination that counsel provided no semblance of adequate capital representation to Mr. Bixby:

> [R]ather than draft original arguments under the appropriate § 2254 standard, Bixby's counsel adopted by reference the arguments of PCR counsel on this matter . . . . [These] arguments necessarily fail to specifically address the primary issue with which this Court is concerned — that is, whether the state court's ruling on this issue is the result of unreasonable factual findings or an unreasonable application of federal law [per § 2254(d).]

JA1492.

Despite being on notice that Mr. Bixby's attorneys failed to perform some of the most rudimentary duties of counsel—addressing the key legal issue in the case and presenting their own original legal work—the district judge did nothing. The district judge could have easily exercised discretion to appoint new attorneys to ensure Mr. Bixby received meaningful, competent representation. Instead, the district court used the unusual failings of counsel—for which Mr. Bixby bore no blame—as a reason to deny relief.

The district court did not mince words about counsel's extreme failures, nor about the reasons why counsel's conduct meant that Mr. Bixby should be denied relief from his death sentence. None of these findings have ever been disputed during Mr. Bixby's habeas litigation:

> The Petition never mentions — let alone discusses the application of
> — the standard to be applied by federal courts reviewing habeas
> petitions filed pursuant to 28 U.S.C. § 2254, and never references any
> putative error(s) in the PCR court's findings of fact or conclusions of
> law.

JA1708-1709.

> Indeed . . . it is difficult to find any original work product generated
> by federal habeas counsel in the prosecution of Petitioner's preserved
> claims.

JA1709.

> Federal habeas counsel seem to expect the Court to both make
> Petitioner's arguments for them, and then admit to having committed
> unspecified error by not intuiting the manner of critique that counsel
> wished to have applied to the PCR proceedings in the first instance.

JA1714.

The district court went on to dismiss counsel's arguments as "largely

nonresponsive to the magistrate judge's reasoning and conclusions," JA1716,

"compound," JA1719, "sophistry," JA1721, "inapt," JA1723, referencing defenses

Respondent did not raise, JA1731, "conclusory" and not "point[ing] the Court to

any specific error in the Report," JA1732, and "difficult to understand." JA1736.

The district court could have seen these "nonresponsive" and "difficult to

understand" arguments that counsel submitted following the magistrate's report

and recommendation, and taken steps to address the problem. It did not. In the

wake of Mr. Bixby's attorneys essentially abandoning their duties as counsel, the

district court denied relief. JA1741.

Mr. Bixby filed a motion to alter and amend the court's judgment, JA1744-1764, which the district court granted only to clarify that it was denying a certificate of appealability (COA), JA1774-1776, entering an amended order to that effect on March 1, 2021. JA1777-1820. Bixby filed a timely notice of appeal. JA1821-22.

A few days after notice of appeal was given and the case was docketed in the Fourth Circuit, a motion was filed to substitute district court counsel with new attorneys. This Court granted the motion, which ultimately led to the involvement of undersigned counsel in this case. *See Bixby v. Stirling*, No. 21-5, DE 7, 8 (motion to replace district court counsel, and order granting substitution).

Subsequently, and now proceeding with new counsel, on March 1, 2022, Mr. Bixby filed with the district court the Rule 60(b) motion that is the subject of this appeal. JA1823.

That same day, Mr. Bixby filed an opening brief in this Court in his habeas appeal. *Bixby v. Stirling*, No. 21-5, DE 52. However, the Court denied Mr. Bixby a COA and dismissed his habeas appeal. *Id*., DE 53, 54. In a petition for rehearing and rehearing en banc, Mr. Bixby argued that the summary and unprecedented denial of a COA – the only capital case over the past decade to be denied full appellate review of a single issue in an initial appeal to this Court – was a compelling reason for rehearing. *Id*., DE 55, pp. 6-9. One week later, this Court

17

placed Mr. Bixby's petition for rehearing in abeyance pending a ruling from the district court on the Rule 60(b) motion. JA1888.

On July 22, 2022, the district court denied Mr. Bixby's Rule 60(b) motion and refused to grant a COA. JA1903. Mr. Bixby subsequently filed a notice of appeal and this appeal was docketed. JA1913.

Following the district court's ruling on Mr. Bixby's 60(b) motion, this Court denied en banc rehearing, JA1912, but requested that the Appellee respond to Mr. Bixby's arguments for panel rehearing. On August 31, 2022, two judges on the panel denied the petition for rehearing, while one judge voted to grant the petition. JA1915.

## SUMMARY OF ARGUMENT

A death sentence was not a given in this case. Steven Bixby's crime is inextricable from his upbringing with two parents deeply riven by mental illness and paranoid delusions about government authority. But for being raised in these bizarre circumstances, Mr. Bixby's crime would have never occurred.

Although Mr. Bixby received a death sentence at trial, on direct appeal, the South Carolina Supreme Court came within a single vote of vacating his death sentence so he could receive a sentence far more reflective of his background and true culpability. It is not every day that the South Carolina Supreme Court divides 3-2 on the question whether to vacate a death sentence.

18

Inexplicably, on federal habeas review, the two attorneys appointed to represent Mr. Bixby failed to raise either of the claims that nearly prevailed in state court, even though both plainly had merit, and both were federal constitutional issues. Yet counsel's unusual failings did not end there. As the district court found, and Respondent has never contested, the attorneys failed to address the central statutory issue on federal habeas review, they failed to submit original work product, they expected the district court to make arguments for them, and they presented arguments that were nonresponsive and difficult to understand. These are not ordinary complaints about ineffective counsel. What happened here was tantamount to Mr. Bixby not having any attorney at all.

The district court, fully aware of this highly unusual circumstance, had every opportunity to address it. After all, Mr. Bixby played no role in these failures. New counsel could have been appointed following the magistrate's recommendation, or after counsel filed objections to the magistrate's order that the district judge found to be nonresponsive and difficult to understand. But instead of alleviating the matter, the district court chose to use counsel's misconduct against Mr. Bixby, as fodder for denying relief from his death sentence.

In order to address this grave defect in his habeas proceedings, Mr. Bixby, upon appointment of new counsel by this Court, promptly availed himself of the appropriate procedural remedy by filing a motion in the district court to reopen the

19

judgment under Federal Rule of Civil Procedure 60(b)(6), which permits such relief in extraordinary circumstances. The district court held that it lacked jurisdiction, but was wrong in this conclusion. Under *Gonzalez v. Crosby*, 545 U.S. 524 (2005), federal habeas courts may employ Rule 60(b)(6) to remedy extraordinary malfunctions by habeas counsel. And in *Holland v. Florida*, 560 U.S. 631 (2010), and *Maples v. Thomas*, 565 U.S. 266 (2012), the Court held in cases involving equitable remedies similar to Rule 60(b)(6) that "extraordinary" attorney misconduct is a proper basis for relieving a capital defendant of the harsh consequences of a procedural defect in their case. In claiming there was no jurisdiction, the district court below failed to address any of this authority.

The question the Court faces now is a limited one. Mr. Bixby is not asking at this early stage that the Court factually find that his habeas attorneys' misconduct was extraordinary, nor that equity requires that his judgment be reopened. The only question is whether Mr. Bixby properly *alleged* a procedural defect that precluded the district court from reaching the merits of a claim for relief. That, Mr. Bixby has done. His attorneys' misconduct prevented the district court from reaching, at a minimum, the two claims that nearly prevailed on direct appeal. These factual allegations are more than sufficient to provide the district court with jurisdiction to hear Mr. Bixby's Rule 60(b) motion on the merits. This Court should remand for the district court to consider the merits of the 60(b) motion in the first instance.

In the absence of this relief, Mr. Bixby may be executed pursuant to a federal habeas proceeding completely undermined by extraordinary attorney misconduct. This would not only harm Mr. Bixby, but the quality of representation in future capital habeas matters, and by extension, the appearance of fairness and justice that is so central to the legal system this Court helps safeguard. Remand is required.

## STANDARDS OF REVIEW

In denying Mr. Bixby's 60(b) motion, the district court also denied a COA. JA1911. However, the district court erred in its belief that the COA standard applies. The district court did not reach the merits of Mr. Bixby's 60(b) motion. Instead, it held the motion "is in substance an unauthorized successive habeas petition over which [the district court] lacks jurisdiction." JA1907. And this Court has squarely held "that [it] need not issue a COA before determining whether the district court erred in dismissing . . . [a] purported Rule 60(b) motion as an unauthorized successive habeas petition." *U.S. v. McCrae*, 793 F.3d 392, 400 (4th Cir. 2015); *see also Shuler v. Clarke*, No. 21-7770, 2022 WL 2990140 (4th Cir. 2020) (citing *McCrae* for the same proposition in a case, like Mr. Bixby's, arising under 28 U.S.C. § 2254). Accordingly, the COA standard does not apply, and the Court must proceed to consider Mr. Bixby's arguments in full.

21

In considering Mr. Bixby's arguments and the decision below, the Court's standard of review is de novo. While the denial of a Rule 60(b) motion on the merits is reviewed for abuse of discretion, "a district court has no discretion to rule on a Rule 60(b) motion that is functionally equivalent to a successive" habeas petition. *U.S. v. Winestock*, 340 F.3d 200, 206 (4th Cir. 2003). As a result, this Court's "review is de novo where a district court construes a motion as a successive [petition] and dismisses it for failure to obtain prefiling authorization from a court of appeals." *McCrae*, 793 F.3d at 397 (citation omitted); *see also McKnight v. Bishop*, 771 F. App'x 201 (4th Cir. 2019) (applying de novo review of a 60(b) denial in a § 2254 case).

De novo review "entails consideration of an issue as if it had not been decided previously." *Stone v. Instrumentation Laboratory Co.*, 591 F.3d 239, 246 (4th Cir. 2009) (citation omitted). This is a "more rigorous" standard for affirmance, and does not call for deference to the lower court. *See Gallagher v. Reliance Standard Life Insurance Co.*, 305 F.3d 264, 269 (4th Cir. 2002). In other words, "[w]hen de novo review is compelled, no form of appellate deference is acceptable." *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991).

## **ARGUMENT**

**I.    The district court erred in holding that it lacked jurisdiction over Mr. Bixby's motion for relief pursuant to Rule 60(b)(6) on the ground that the motion was in substance a successive habeas petition.**

     **A.    Supreme Court precedent instructs that federal courts have jurisdiction to consider Rule 60(b) motions based on allegations of extraordinary attorney misconduct. The district court below erred in failing to recognize this precedent and ruling otherwise.**

The district court believed it lacked jurisdiction over Mr. Bixby's 60(b) motion because it "is in substance an unauthorized successive habeas petition." JA1907. In reaching this conclusion, the court acknowledged that Mr. Bixby's 60(b) motion is rooted in the extreme and highly unusual failings of his attorneys at that stage, JA1906-1907, but failed to appreciate the clear jurisdictional import of those allegations.

In habeas corpus proceedings, the Rules of Civil Procedure apply "to the extent that they are not inconsistent with any statutory provisions . . . ." *See* Rule 12 of the Rules Governing Section 2254 Cases. Thus, under Civil Procedure Rule 60(b)(6), a habeas petitioner may seek to reopen their federal habeas judgment for "any . . . reason that justifies relief." This form of relief is available in "extraordinary circumstances" and serves as a "grand reservoir of equitable power to do justice in a particular case." *Reid v. Angelone*, 369 F.3d 363, 374 (4th Cir. 2004) (citations omitted).

23

In the habeas context, however, there are statutory limitations on the types of arguments that may be made in a Rule 60(b) motion. Because 28 U.S.C. § 2244 only allows petitioners to raise second or successive claims in specific circumstances, Rule 60(b) may not be used to circumvent those statutory limits. The Supreme Court has resolved this tension by explaining that Rule 60(b) motions may not "seek[ ] to add a new ground for relief" or otherwise "attack[ ] the federal court's previous resolution of a claim *on the merits* . . . ." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005) (emphasis in original). However, a 60(b) motion is proper when it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.* The enforcement of this distinction between cognizable Rule 60(b) motions and claims subject to § 2244's limitations has been deemed jurisdictional. *See Richardson v. Thomas*, 930 F.3d 587, 596 (4th Cir. 2019).

In *Gonzalez*, authored by Justice Scalia, the Supreme Court provided examples to illustrate the difference between 60(b) grounds and habeas claims. One of those examples has particular relevance here. The Court explained:

> [A]n attack based on the movant's own conduct, or his habeas counsel's omissions, *ordinarily* does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably.

545 U.S. at 532, n.5 (emphasis added).

24

The modifier "ordinarily" is significant. Justice Scalia's majority opinion could have said that no instance of habeas counsel's omissions could ever go to the integrity of the proceedings, and thus could never be raised in a 60(b) motion. It did not. Instead, the Court specified that ordinary omissions by counsel cannot be raised in the 60(b) context. The obvious corollary is that extraordinary omissions by habeas counsel can be so raised in a Rule 60(b) motion.

This conclusion is confirmed by the Supreme Court's reliance in *Gonzalez* on *Harris v. U.S.*, 367 F.3d 74, 81 (2d Cir. 2004). The Supreme Court favorably cited *Harris*'s holding than an ordinary counsel-ineffectiveness claim could not be used in a 60(b) motion to raise a claim previously omitted by the petitioner's attorney. *Gonzalez*, 545 U.S. at 531 (citing *Harris*, 367 F.3d at 80-81). But, *Harris* also explained, "a Rule 60(b)(6) movant must show that his lawyer agreed to prosecute a habeas petitioner's case, abandoned it, and consequently deprived the petitioner of any opportunity to be heard at all." 367 F.3d at 81 (citations omitted). Thus, *Gonzalez* and *Harris* both support the distinction between typical ineffective assistance claims, which are not addressable through Rule 60(b), and extraordinary counsel misconduct, which is.

This conclusion is reinforced by the Supreme Court's similar decisions in *Holland v. Florida*, 560 U.S. 631 (2010), and *Maples v. Thomas*, 565 U.S. 266 (2012). In *Holland*, the Court held that a capital habeas petitioner's statutory

deadline for filing his federal habeas petition could be reviewed for equitable tolling because the prisoner's argument was based on "extraordinary" attorney misconduct rather than a "'garden variety claim' of attorney negligence." 560 U.S. at 651-52. In *Maples*, the Court held there was cause to excuse the capital petitioner's procedural default of claims in state court because his state attorneys abandoned him at a critical stage of the case, resulting in "extraordinary circumstances quite beyond [the petitioner's] control." 565 U.S. at 289. In both cases, then, as in *Gonzalez* itself, the Supreme Court held that extraordinary attorney misconduct is an appropriate matter to address through a proceeding in equity, such as a Rule 60(b) motion.[3]

This approach makes sense. Under *Gonzalez*, Rule 60(b) motions in the habeas context are limited to matters that affect the integrity of the federal habeas proceedings. *See also Richardson*, 930 F.3d at 597 (Rule 60(b) motions must "assert[ ] a procedural defect in the integrity of the original proceedings"). And the Supreme Court has consistently recognized that the provision of counsel in capital

---

[3] Although *Holland* and *Maples* involved different types of matters in equity, the Court in *Maples* rejected arbitrary distinctions between different equitable proceedings. "We see no reason," the Court said, "why the distinction between attorney negligence and attorney abandonment should not hold in both contexts." *Maples*, 565 U.S. at 283, n.7. The same is true of Mr. Bixby's Rule 60(b) motion, which, like tolling in *Holland* and cause-and-prejudice in *Maples*, is an equitable remedy. *See Reid*, 369 F.3d at 374.

habeas corpus cases has a procedural function, as a necessary safeguard to ensure those matters are fair and reliable. *See Martel v. Clair*, 565 U.S. 648, 659 (2012) (explaining that the statutory "enhanced rights of representation" in capital habeas corpus cases "reflect a determination that quality legal representation is necessary in all capital proceedings to foster fundamental fairness in the imposition of the death penalty.") (internal quotations omitted) (quoting *McFarland v. Scott*, 512 U.S. 849, 855, 859 (1994)). In this respect, Mr. Bixby's Rule 60(b) motion, addressing an extraordinary breakdown in representation that undermined the procedural fairness of his habeas case, is precisely the type of defect that Rule 60(b) and *Gonzalez* were designed to address.

Against this backdrop, the correct jurisdictional approach to Mr. Bixby's Rule 60(b) motion becomes clear. He filed a 60(b) motion alleging his attorneys in federal district court abandoned him, and committed gross negligence in multiple ways, including their failure to address or present any reason why relief was not barred by § 2254(d), their failure to raise direct appeal claims on which Mr. Bixby only narrowly lost 3-2 in the state supreme court, and their submission of pleadings that almost exclusively cut-and-pasted the work of Mr. Bixby's state court counsel. JA1830-1834, JA1837-1842. These allegations of extraordinary misconduct fall squarely into the framework established in *Gonzalez*, *Maples*, and *Holland*, which each recognized that garden variety attorney-negligence will not sound in equity,

but extraordinary misconduct will. *See also Holland*, 560 U.S. at 659 (Alito, J.,

concurring) ("If true, petitioner's allegations would suffice to establish

extraordinary circumstances beyond his control."). As such, Mr. Bixby filed a Rule

60(b) with a proper jurisdictional basis, which the district court erred in failing to

recognize.[4]

    The district court's primary reason for finding jurisdiction lacking was that

Mr. Bixby's "motion repeatedly indicates an intent to raise new grounds for habeas

relief" and "seeks an opportunity not to cure a lack of integrity in the proceedings,

but to replead the § 2254 petition in a manner that rectifies habeas counsel's

omissions." JA1907-1908. These concerns are misplaced.

    Starting with the latter, Mr. Bixby is not asking, as the district court claimed,

"to replead the § 2254 petition in a [different] manner." At a minimum, the relief

Mr. Bixby seeks is an opportunity to raise, for the first time, the two direct appeal

claims on which he only lost by the narrowest of margins in state court, and which

federal habeas counsel inexplicably failed to raise. This is not a repleading of

claims already decided, but an opportunity to raise claims that were abandoned and

---

[4] The district court did not address any of this precedent showing that extraordinary counsel misconduct can be a procedural defect cognizable under Rule 60(b). That court instead avoided the question entirely and believed "it would be extraneous for the Court to weigh in on the question . . . whether there is some threshold degree of competence or effectiveness that" may be raised in the 60(b) context. JA1910.

never decided because of the procedural defect caused by habeas counsel's extraordinary misconduct.

This brings us to the second of the district court's concerns, that Mr. Bixby's 60(b) motion improperly "indicate[d] an intent to raise new grounds for habeas relief." This reasoning is at odds with Supreme Court precedent and a straightforward approach to 60(b) motions. As a general matter, the very point of 60(b) motions is to reach substantive grounds for relief that were not previously addressed because of a procedural defect. *See U.S. v. Vialva*, 904 F.3d 356, 361 (5th Cir. 2018) ("the question before us is not whether Rule 60(b) motions can reopen proceedings—they certainly can—but whether [petitioners] have actually alleged procedural defects cognizable under Rule 60(b)."); *In re Pickard*, 681 F.3d 1201, 1206 (10th Cir. 2012) ("What else could be the purpose of a 60(b) motion? The movant is always seeking in the end to obtain § 2255 relief. The movant in a true Rule 60(b) motion is simply asserting that he did not get a fair shot in the original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings.").

*Buck v. Davis*, 137 S. Ct. 759 (2017), illustrates the point. The capital petitioner in *Buck* raised a claim in federal district court that his trial counsel was constitutionally ineffective, but the claim was procedurally barred in federal court—and thus never decided—because it had been defaulted by the state courts

29

on initial review. *Id.* at 770. Years later, however, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012), creating an equitable exception to federal procedural default rules, and this exception created a pathway for the federal courts to consider Mr. Buck's heretofore-defaulted claim on the merits. *Buck*, 137 S. Ct. at 771. The upshot was that the Supreme Court granted Mr. Buck's Rule 60(b)(6) motion, permitting him merits review of a new claim that the federal courts had not previously addressed. *Id.* at 780.

Mr. Bixby is seeking the same procedural relief and review that the Supreme Court granted in *Buck*. Mr. Buck had a claim whose merits the federal courts never reached because of a procedural defect (the application of the law prior to *Martinez*), and Rule 60(b) was considered a proper way of remedying the defect and reaching the merits. The same is true for Mr. Bixby. He has claims whose merits the federal courts have never reached (at a minimum, his direct appeal claims), because of a procedural defect, namely, extraordinary misconduct by his attorneys. Just as in *Buck*, Rule 60(b) is the appropriate vehicle for repairing the procedural error.

This application of Supreme Court precedent to Mr. Bixby is also in accord with this Court's articulation of the proper jurisdictional grounds for Rule 60(b) motions in habeas cases:

> The narrow role carved out in *Gonzalez* for Rule 60(b) motions in the habeas context . . . allows a district court to reopen nonmerits-based denials or dismissals of a state prisoner's federal habeas petition or claim, which resulted in no federal court having considered the merits of the claim at all. The Rule 60(b) movant is not raising a new habeas corpus claim, or attacking the federal court's previous denial of the claim on the merits, when he "merely asserts that a previous ruling which *precluded* a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar.

*Richardson*, 930 F.3d at 596 (quoting *Gonzalez*, 545 U.S. at 532, n.4) (emphasis in original).

Mr. Bixby's case hits this mark. He seeks review of the direct appeal claims that his federal habeas counsel failed to raise, and any other meritorious claims they may have missed through their extraordinary failures of advocacy. These are by definition claims, as identified in *Richardson*, where "no federal court [has] considered the merits . . . at all" and where the earlier procedural defect "precluded a merits determination . . . in error." And, critically, the reason these claims were never reached is procedural in nature. Mr. Bixby alleges extraordinary misconduct by his attorneys, resulting in their failure to raise the claims entirely.

There is one minor distinction from *Richardson*, but it makes no difference. Here, there is no "nonmerits-based denial or dismissal" because the direct appeal claims were never raised at all. But because the failure to raise the claims was itself the consequence of a procedural defect—extraordinary counsel misconduct—this difference with *Richardson* should not affect the Court's decision. Indeed, the issue

of extraordinary counsel misconduct was not before the Court in *Richardson*, and so it makes sense that Mr. Bixby's precise scenario did not make its way into that panel's summary of 60(b) jurisdictional grounds.

Moreover, *Gonzalez*, *Holland*, and *Maples* all make clear that extraordinary counsel misconduct can amount to a procedural defect that may be addressed through an equitable remedy like a Rule 60(b) motion. It would be anomalous, irrational, and simply unfair for this Court to entertain equitable relief for procedural defects that preclude merits decisions on claims that were raised, but preclude equitable relief for procedural defects that prevented a claim from being raised in the first place. After all, the very purpose of Rule 60(b) is to fix the defect and its negative effects on the initial proceeding, not ignore it.

The district court's only other basis for finding no jurisdiction was its reliance on *Gamboa v. Davis*, 782 F. App'x 297 (5th Cir. 2019). JA1908-1910. But *Gamboa* provides this Court with little guidance. Aside from being an unpublished, divided, and out-of-circuit panel opinion, the *Gamboa* majority provided zero reasoning for its decision, and instead relied solely on a conclusory sentence from another Fifth Circuit decision that "arguments about counsel's failure to discover and present particular arguments sound in substance, not in procedure." *Gamboa*, 782 F. App'x at 301 (citations omitted). Moreover, the underlying decision on which *Gamboa* relied, *In re Coleman*, 768 F.3d 367 (2014), involved facts far

different from those presented here. In *Coleman*, the alleged procedural defect

supporting the Rule 60(b) motion was additional evidence that counsel failed to

discover and present in support of a previously-decided claim. 768 F.3d at 371-72.

Here, however, Mr. Bixby is attempting to obtain review of claims *never decided*

*and never raised* due to the extraordinary failings of his district court attorneys.

Thus, while the petitioner in *Coleman* attacked impermissibly a prior merits ruling,

Mr. Bixby does not.

Judge Dennis concurred in the result in *Gamboa* because he felt it was

compelled by circuit precedent, but wrote separately to explain why he believed

that precedent was wrong. Judge Dennis relied in part on the Supreme Court's

implicit holding in *Gonzalez* "that some [extraordinary] omissions by counsel

could rise to the level of impacting the integrity of the proceedings." 782 F. App'x

at 302. He concluded, where "a petitioner alleges that counsel abandoned him prior

to filing a habeas petition and ultimately filed a petition containing only pro forma

claims, allowing the petitioner to proceed with new and adequate representation

would cure the defect in the habeas proceedings resulting from counsel's

abandonment." *Id.* at 304. This conclusion is both well-reasoned and fair. It would

not permit Mr. Bixby anything untoward, nor would it undermine the AEDPA's

interest in finality and its purpose of leaving previously-decided claims

undisturbed. All Mr. Bixby seeks is one fair chance to litigate claims abandoned

due to the procedural defect created by exceptional and egregious failings by his appointed attorneys.

Respondent is likely to confuse the issue and argue that even if abandonment or extreme misconduct by counsel could theoretically support a 60(b) motion, all Mr. Bixby has alleged is mine-run ineffective assistance of counsel. But an argument of this sort would run afoul of the analysis this Court applies to jurisdiction. The Court typically does not, at this stage, ask whether allegations are *persuasive*, but merely whether they are *sufficient*. If they are, jurisdiction exists and the inquiry ends. *See Kerns v. U.S.*, 585 F.3d 187, 193 (4th Cir. 2009) ("when a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged."). On the other hand, if Respondent does "challenge[ ] the veracity of the [jurisdictional] facts," or if the "jurisdictional facts are intertwined with . . . the merits," then Mr. Bixby would still prevail, because "evidentiary proceedings" and "appropriate discovery" are needed to resolve factual questions before jurisdiction can be decided. *See id.* In either case, Respondent is left with the short end of the stick. *See also id.* at 193 ("when the jurisdictional facts and the facts central to a tort claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues.").

In the end, the jurisdictional analysis is simple. In habeas cases, Rule 60(b) motions may address procedural defects in the initial habeas proceeding that precluded a merits ruling on certain claims. In *Gonzalez*, *Holland*, and *Maples*, the Supreme Court recognized that attorney abandonment or other extreme misconduct could form the basis for a 60(b) motion and other types of equitable relief. Mr. Bixby credibly alleges just that. His attorneys effectively abandoned him by ignoring the central legal standard controlling his case, ignoring direct appeal claims that had nearly won in state court, and doing nothing more on the case than cutting-and-pasting the work of prior state court attorneys. Taken as true, these allegations establish that the district court had jurisdiction to consider Mr. Bixby's 60(b) motion on the merits.

**B.** **Because the district court's only ruling was its erroneous decision that it lacked jurisdiction over the Rule 60(b) motion, and it did not reach the merits, the appropriate remedy is for the Court to remand Mr. Bixby's motion for full merits review.**

The district court was unambiguous in its decision not to reach the merits of Mr. Bixby's Rule 60(b) motion because it "lack[ed] jurisdiction." JA1907. *See also* JA1911 ("constru[ing] [the 60(b) motion] as an unauthorized successive habeas petition"). Given this, the appropriate remedy is for this Court to find the district court erred with respect to jurisdiction for the reasons outlined above, and remand for full review.

This Court has been clear that when a district court errs in its ruling on 60(b) jurisdiction, "the merits of [the motion] are best addressed by the district court in the first instance." *McCrae*, 793 F.3d at 401. Although there is no absolute bar on reaching the merits, the Court has also said that its "deferential standard of review regarding Rule 60(b) motions recognizes the district court's superior position for evaluating the merits." *Id.* The two cases that *McCrae* relies on for this approach supply persuasive reasoning:

> The disposition of motions made under Rule[ ] ... 60(b) is a matter which lies largely within the discretion of the trial judge and his action is not lightly to be disturbed by an appellate court. *Consol. Masonry & Fireproofing*, *Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir.1967).

> [T]he trial court is in a much better position to pass upon the issues presented in a motion pursuant to Rule 60(b). *Std. Oil Co. of Cal. v. U.S.*, 429 U.S. 17, 19 (1976).

*McCrae*, 793 F.3d at 401.

This approach, and preference for remand, is consistent with the nature of the 60(b) analysis. Rule 60(b)(6) "does not particularize the factors that justify relief;" instead, courts must balance "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988). As an equitable proceeding, Rule 60(b)(6) requires courts to consider these motions "on a case-by-base basis" rather than through the application of "mechanical rules," and to

account for the "specific circumstances" of each matter. *Holland v. Florida*, 560 U.S. 631, 649-50 (2010). Then, on appeal, it becomes this Court's role to review the district court's fact-intensive analysis for abuse of discretion. Were the Court to reach Mr. Bixby's motion in its present posture, it would subvert this well-established structure.

There is also good reason to remand for further review, because Mr. Bixby's Rule 60(b) motion raises substantial concerns that should be addressed by the district court in the first instance. As an initial matter, one of the key elements of a Rule 60(b) motion is that it must involve a meritorious claim or defense. *See U.S. v. Welsh*, 879 F.3d 530, 533 (4th Cir. 2018) (setting forth 60(b) elements). Mr. Bixby should satisfy this requirement without difficulty. At this stage, he is seeking review of the two direct appeal sentence-related claims that only narrowly lost in the South Carolina Supreme Court by a 3-2 margin, along with any other meritorious claims that could have been raised but-for district court counsel's extraordinary failings.

The fact that two state supreme court justices would have granted Mr. Bixby relief from his death sentence establishes, at the very least, a prima facie showing that both claims have merit. Indeed, a claim is "substantial" and has "some merit" when "reasonable jurists could debate whether . . . [the issue] should have been resolved in a different manner . . . ." *Martinez v. Ryan*, 566 U.S. 1, 15 (2012)

37

(incorporating the certificate of appealability standard described in *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). This Court has said plainly, "[i]f reasonable jurists could debate the merits of the underlying claim, then it must have (at least) some merit." *Owens v. Stirling*, 967 F.3d 396, 424 (4th Cir. 2020). As such, on merits review in the district court, Mr. Bixby will likely satisfy this important element of his Rule 60(b) claim.

Another hurdle Mr. Bixby will face on merits review of his 60(b)(6) motion is whether it involves an extraordinary circumstance. *See Gonzalez*, 545 U.S. at 535 ("movant seeking relief under Rule 60(b)(6) [must] show 'extraordinary circumstances' justifying the reopening of a final judgment.") (citations omitted). Here again, Mr. Bixby will have a strong argument. There are numerous ways in which the malfunction that occurred in his case may be viewed as extraordinary.

First, his attorneys cut-and-pasted their pleadings. It is undisputed, as the magistrate judge found, that "rather than draft original arguments under the appropriate § 2254 standard, Bixby's counsel adopted by reference the arguments of PCR counsel on this matter . . . ." JA1492. The district judge likewise found that "it [was] difficult to find any original work product generated by federal habeas counsel in the prosecution of Petitioner's preserved claims." JA1709. This type of misconduct has led at least one federal court to sanction attorneys. *See Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 158 (3d Cir. 2021) ("copy-and-paste jobs . .

38

. reflect a dereliction of duty, not an honest mistake"). In another recent case, an attorney's law license was suspended for five years for misconduct that included submitting a petition that was "almost exclusively the work product" of other attorneys. *N.C. State Bar v. Megaro*, 2022-NCCOA-718, ¶ 11 (N.C. App. 2022). These cases show that Mr. Bixby's circumstances far exceed ordinary ineffective assistance of counsel. *See also Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988) ("Rule 11 is an extraordinary remedy, one to be exercised with extreme caution.").

Second, there is zero dispute that Mr. Bixby's attorneys filed pleadings that failed to make the key legal arguments under § 2254(d), which are required in every capital habeas case, and are a mandatory precursor to a federal court even *considering* whether relief is warranted. *See* 28 U.S.C. § 2254(d) (explaining federal habeas relief "*shall not be granted* with respect to any claim that was adjudicated on the merits in State court proceedings *unless*" certain conditions are present) (emphasis added); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("the deferential standards prescribed by § 2254 control whether to grant habeas relief"). This isn't an oversight, or an unwise but understandable strategic choice. This was an extraordinary failure by Mr. Bixby's federal habeas counsel to satisfy even the most minimal definition of what is involved in providing meaningful habeas representation. *See also* S.C. Rules of Professional Conduct, Rule 1.1, Comment 2

("Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve . . . ."); Rule 1.1, Comment 5 ("Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem . . . ."). Here, district court counsel's pleadings reveal they had no understanding of the legal problems a habeas petitioner faces under AEDPA review.

The list of reasons why Mr. Bixby's case is extraordinary goes on:

- This is a capital case in which Mr. Bixby may be executed despite undisputed district court findings that his attorneys at that stage utterly failed in their duties in multiple respects.

- The district court had ample notice of the highly unusual malfunction taking place in this case. The magistrate issued a recommended decision taking counsel to task for failing to submit original legal work and failing to address the key legal question under § 2254. Counsel then filed objections to the magistrate's decision that the district court itself found were "nonresponsive" and unhelpful. But even though Mr. Bixby bore no blame in this debacle, the district court used counsel's extreme failings against him, rather than exercising its sound discretion to remedy the matter.

- Mr. Bixby's attorneys failed to raise the two direct appeal claims that came within a single vote of winning their client a life sentence in state court. There is no conceivable or articulable reason that could explain this failure, aside from grievous inattention or a gross misunderstanding of federal habeas practice.

- These extreme failures occurred in a proceeding that has been described as our legal system's most vital check against illegal convictions and sentences. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 555-56 (2004) (Scalia, J., and Stevens, J., dissenting)

40

(citing Blackstone and The Federalist Papers, and explaining it was "well known to the Founders" that "habeas corpus [is] the instrument by which due process could be insisted upon by a citizen illegally imprisoned").

- In failing to remedy the attorney misconduct that occurred here, a case carrying the penalty of death, the Court risks its own institutional credibility as a fair arbiter of justice, and sets a dangerous precedent for the type of representation that attorneys may provide in future capital habeas matters. *See Buck*, 137 S. Ct. at 778 (Rule 60(b)(6) motions are designed to address the "risk of injustice to the parties" as well as the "risk of undermining the public's confidence in the judicial process.").

This is not an exhaustive account of the explanations why Mr. Bixby's case is extraordinary, nor are the reasons supporting relief fully argued here. The point is that there is much to address on remand. Rule 60(b)(6) motions involve fact intensive, flexible, case-by-case inquiries. The rule "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. U.S.*, 335 U.S. 601, 614-15 (1949). It is a "grand reservoir of equitable power to do justice in a particular case." *Reid v. Angelone*, 369 F.3d 363, 374 (4th Cir. 2004) (citation omitted). That equitable power is particularly important here, where "the need to balance the finality of the judgment" must be weighed "against the more irreversible finality of [Mr. Bixby's] execution." *Aikens v. Ingram*, 652 F.3d 496, 505 (4th Cir. 2011) (Diaz, J., concurring) (citation omitted).

The Court has jurisdiction to consider the procedural defect that Mr. Bixby's Rule 60(b) motion alleges. His underlying claims are meritorious. The circumstances, extraordinary, at least on preliminary review. Remand for merits consideration is not only appropriate, but required. And the relief here is modest. All that Mr. Bixby seeks is "one fair opportunity to seek federal habeas relief from his conviction" and death sentence, free from the egregious attorney misconduct that undermined the integrity of his initial habeas review. *Banister v. Davis*, 140 S. Ct. 1698, 1702 (2020).

## **CONCLUSION**

For the reasons discussed here, the Court should reverse the judgment of the district court holding that it lacked jurisdiction to consider Mr. Bixby's Rule 60(b)(6) motion, and remand for merits review. The Court may grant this relief on the briefs without argument. In the alternative, Mr. Bixby requests oral argument on the issue presented.

Respectfully submitted on December 14, 2022.

John G. Baker
Federal Public Defender
for the Western District of North Carolina

/s/ David Weiss
David Weiss
Assistant Federal Public Defender
E-mail: david_c_weiss@fd.org

Gretchen L. Swift
Assistant Federal Public Defender
Email: gretchen_swift@fd.org

Capital Habeas Unit for the Fourth Circuit
129 West Trade Street, Suite 300
Charlotte, NC 28202
Tel: (704) 374-0720

Joshua Snow Kendrick
Kendrick & Leonard, P.C.
P.O. Box 6938
Greenville, SC 29606
(864) 760-4000
Josh@KendrickLeonard.com

COUNSEL FOR PETITIONER STEVEN BIXBY

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [10,056] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>December 14, 2022</u>          <u>/s/ David Weiss</u>
                                                            *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of December, 2022, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Melody J. Brown
William J. Maye
OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA
Post Office Box 11549
Columbia, South Carolina  29211
(803) 734-3970

*Counsel for Appellees*

I further certify that on this 14th day of December, 2022, I caused a copy of the Sealed Volume of the Joint Appendix to be served, via U.S, Mail, upon counsel for the Appellee, at the above address.

/s/ David Weiss
*Counsel for Appellant*